# In the United States Court of Federal Claims

No. 10-319C

(Filed Under Seal: August 27, 2010)

(Reissued for Publication: September 7, 2010)

*******************************************  *
                                             *
CERES GULF, INC.,                            *
                                             *
                        Plaintiff,           *
                                             *
v.                                           *  Pre-award  Bid  Protest;  Subject
                                             *  Matter Jurisdiction; Ripeness; Lack
UNITED STATES,                               *  of Meaningful Discussions; Army's
                                             *  Corrective Action Following GAO
                        Defendant,           *  Protest; Amendment to Solicitation;
and                                          *  Solicitation of Revised Proposals.
                                             *
COASTAL MARITIME, LLC,                       *
                                             *
                        Defendant-Intervenor. *
                                             *
*******************************************  *

*David W. Klaudt*, with whom was *Jason M. Hopkins*, Locke Lord Bissell & Liddell LLP, Dallas, Texas, for Plaintiff.

*Corinne A. Niosi*, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Mark A. Melnick*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., *Wade L. Brown*, U.S. Army Materiel Command, Of Counsel, for Defendant.

*Michael A. Gordon*, Michael A. Gordon PLLC, Washington, D.C., for Defendant-Intervenor.

## OPINION AND ORDER[1]

---

[1] The Court issued this opinion under seal on August 27, 2010, and gave the parties until September 3, 2010, to submit any proposed redactions of competition-sensitive, proprietary, confidential or other protected information. Pursuant to the Court's request, the parties submitted proposed redactions, which were accepted by the Court. Redactions are indicated by [. . .].

WHEELER, Judge.

In this bid protest, Plaintiff, Ceres Gulf, Inc. ("Ceres Gulf"), challenges the decision of the Department of the Army, Military Surface Deployment and Distribution Command ("Army"), to rescind a contract award to Ceres Gulf and to solicit revised proposals as corrective action following a protest filed at the Government Accountability Office ("GAO") by a competing offeror, Coastal Maritime, LLC ("Coastal Maritime"). The procurement involves stevedoring work at three ports in Texas for vessels carrying Defense Department cargo.  Among other tasks, the contract calls for the loading and unloading of inoperable equipment weighing up to 150,000 pounds.  Ceres Gulf was the contract awardee, but Coastal Maritime, the lowest priced offeror, filed a protest at the GAO challenging the Army's evaluation of its proposal and contending that the Army failed to conduct meaningful discussions with it.  On April 29, 2010, the Army responded to Coastal Maritime's protest by stating that it would terminate the contract with Ceres Gulf and allow offerors to submit revised proposals based upon an amended solicitation. Ceres Gulf then protested the Army's proposed corrective action at the GAO.  While the Army's motion to dismiss Ceres Gulf's GAO protest was pending, Ceres Gulf filed suit on May 25, 2010 asking this Court to enjoin the Army from inviting revised proposals because the proposed corrective action allegedly lacked a rational basis.  (Compl. 5.)

The Court considered this protest on an expedited basis.  Defendant submitted a certified copy of the administrative record on June 7, 2010, and added certain omitted materials on July 7, 2010.  On June 21, 2010, Ceres Gulf filed a motion for judgment on the administrative record pursuant to Rule 52.1 of the Court of Federal Claims ("RCFC"). On July 6, 2010, Defendant filed a motion to dismiss under RCFC 12(b)(1), or in the alternative, a motion for judgment on the administrative record.  Defendant contends that the Court lacks jurisdiction over the protest because Ceres Gulf is not challenging a solicitation, a proposed award, an award, or an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement" in accordance with 28 U.S.C. § 1491(b)(1) (2006).  (Def.'s Mot. 12-13.)  Defendant further asserts that Ceres Gulf's complaint regarding a "non-final agency action" is not ripe for review.  Id. at 14. On the merits, Defendant argues that the Army acted rationally in taking corrective action and soliciting revised proposals.  Id. at 17-24.  On July 6, 2010, Defendant-Intervenor, Coastal Maritime, also filed a motion for judgment on the administrative record arguing that the Army had a rational basis for taking corrective action to clarify the technical requirements in the solicitation.  (Def. Intervenor's Mot. 15-19.)  The Court heard oral argument on the parties' motions on August 17, 2010.

For the reasons stated below, the Court finds that it has jurisdiction to hear Ceres Gulf's claims.  Contrary to Defendant's assertions, Ceres Gulf is challenging the Army's decision to rescind the contract and solicit revised proposals under an amended solicitation.  Protests involving a challenge to a solicitation clearly are under this Court's purview pursuant to 28 U.S.C. § 1491(b)(1).  Defendant's argument that this case is not

yet ripe for review also lacks merit.  Ceres Gulf's allegation that it was harmed by the Army's decision to issue an amended solicitation, in essence, is a protest relating to an agency's pre-award conduct.  Were the Court to deny Ceres Gulf the opportunity to contest alleged errors in the procurement now, Ceres Gulf potentially could be precluded from later asserting those claims, should it fail to win the award under the amended solicitation.  See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007); Weeks Marine, Inc. v. United States, 575 F.3d 1352 (Fed. Cir. 2009).  Accordingly, Defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED.

The Court, however, finds that Defendant's motion for judgment on the administrative record has merit.  A review of the record demonstrates that the Army's decision to take correct action by amending the solicitation to add new and material requirements was reasonable under the circumstances.  Indeed, the amended solicitation addresses the very basis of Coastal Maritime's protest before the GAO and ensures that the submittal of revised proposals is fair to all offerors involved.  Accordingly, the Court DENIES Ceres Gulf's request for a permanent injunction and its motion for judgment on the administrative record, and GRANTS Defendant's and Defendant-Intervenor's cross-motions for judgment on the administrative record.

Background

A.  The Solicitation

On September 8, 2009, the Army issued Solicitation No. W81GYE-09-R-0034 ("Solicitation") seeking stevedoring and related terminal services involving the "receipt, processing, and/or loading/discharging" of Department of Defense cargo at three ports in Texas: Beaumont, Port Arthur, and Corpus Christi.  Administrative Record ("AR") 29, 132-33, 139.  The Army identified the contract as providing "essential contractor services in support of mission essential functions."  AR 189.  Potential offerors would be required, among other things, to move critical equipment, weapon systems, and supplies in direct support of Operations Enduring Freedom and Iraqi Freedom.  (Def.'s Mot. 3.)  Specifically, the contractor would be responsible for providing qualified labor, equipment, and materials necessary to load and unload certain "deadline" or inoperable military equipment.  AR 132, 139.

The Army intended to award a firm fixed price indefinite delivery/indefinite quantity contract with one base year and three one-year options.  AR 7.  The lowest priced, technically acceptable offeror would receive the contract in accordance with Federal Acquisition Regulation ("FAR") 15.101-2 and 52.212-2.  AR 87.  Thus, if the Army found the lowest priced offeror to be technically acceptable, the evaluation process would stop and an award would be made to that offeror.  Id.

The Solicitation included five technical factors that an offeror's proposal had to pass in order to be considered technically acceptable.  <u>See</u> AR 88-92.  Failure to satisfy any one of the five factors would render the entire proposal technically unacceptable.  AR 92.  At issue in this bid protest is Technical Factor 1 for "Equipment."  AR 88-89.  Technical Factor 1 provides that the offerors' proposals would be evaluated "to determine their ability to perform required stevedoring-related terminal services in accordance with the Performance Work Statement (PWS)."  AR 88.  Technical Factor 1 is divided into three sub-factors: Sub-factor 1a, entitled "Types, mix and quantities of equipment;" Sub-factor 1b, entitled "Equipment condition;" and Sub-factor 1c, entitled "Specialized Equipment."  AR 88-89.  Sub-factor 1a lists the number and types of specialized equipment offerors were required to possess at each of the three port locations.  <u>Id.</u>  For example, offerors must provide one 45-55,000 pound forklift and three 25-30,000 pound forklifts at all three Texas ports.  <u>Id.</u>  Sub-factor 1a further required offerors to provide proof of ownership or alternatively, leases or "other binding agreement[s]" demonstrating that they had immediate access to the equipment listed.  AR 89.

Under Sub-factor 1b, offerors had to demonstrate that all of the equipment listed under Sub-factor 1a had undergone recent inspection, "all load testing," and any licensing or certification required by federal, state, and local regulations.  <u>Id.</u>  Sub-factor 1c similarly set forth requirements for the equipment listed in Sub-factor 1a.  Sub-factor 1c specifically provided:

> **Standard**: Offerors shall clearly demonstrate viable arrangements to obtain all specialized and additional equipment (e.g. 100 ton mobile crane, heavy equipment recovery vehicle) required by the PWS.  The proposal must include all lease and other agreements in place that establish that the [o]fferor has ready access to required specialized and/or additional equipment in a timely basis.

<u>Id.</u>

The Army later issued several amendments to the Solicitation, clarifying the terms of Technical Factor 1.  Particularly relevant to this protest, the Army added Section 6.0, entitled "Port Support Activities," ("PSA") to provide "a synopsis of requirements that . . . were not included in the previous contract."  AR 240.  Under sub-part 6.1a, entitled "Deadline Vehicle Recovery," the Army explained that one of the primary purposes of the contract was to "move inoperable equipment on/off ships, line-haul trucks and railcars, and within the staging area."  <u>Id.</u>  Thus, in order to be considered technically acceptable, offerors would need recovery vehicles "capable of retrieving dead/tow wheel and track vehicles in excess of 150,000 lbs."  <u>Id.</u>  Offerors also would be required to "remove deadline equipment from vessels with various deck heights e.g. lowest profile of

10'6"" and remove refueling vehicles, 5T wreckers, or any vehicle over 10,000 pounds "via use of tow bar and an operational equivalent capacity vehicle for tow." Id.

To reflect the changes explained in Section 6.0, the Army also added a list of PSA equipment to the specialized vehicles listed under Technical Sub-factor 1a.  See AR 195. Thus, in addition to the specialized equipment previously listed under Sub-factor 1a, offerors would be required to provide two pieces of heavy tow equipment under ten feet six inches at the Beaumont, Port Arthur, and Corpus Christi locations. Id. The new PSA requirements also called for four wreckers, four jump vehicles, and four "air comp" vehicles at the Texas ports, among other heavy tow equipment. Id.

B.  Submission and Evaluation of Initial Proposals

The due date for submittal of proposals was November 23, 2009. AR 916. Ceres Gulf, Coastal Maritime, and two other offerors submitted proposals in response to the Solicitation. Id. Although all of the offers were below the Government's estimate of $25,314,794.87, the Army determined that none of the initial proposals was technically acceptable. AR 918 ("Each offer's [sic] proposal was rated technically unacceptable (fail) due to omissions and subcontracting plans that did not address all of the required elements per FAR 19.704."). Specifically, all four proposals received a rating of "Fail" for Technical Sub-factor 1c. AR 917.

In its initial evaluation of Coastal Maritime's proposal, the Army noted that the company listed three pieces of equipment to perform the heavy tow functions (PSA services) required by the PWS: the Hough T-300 pushback tractor; the Taylor TT-300 pushback tractor; and the U-30 aircraft tug. AR 2334. The Army further noted that Coastal Maritime provided two lease proposals: one to lease the U-30 aircraft tug through Oshkosh Equipment LLC, and one to lease two Taylor TT-300s and two Northwestern PSI pushback tractors through Houston International Aircraft Support, Inc. Id. While Coastal Maritime provided some of the capabilities and characteristics of its equipment, the Army ultimately concluded that Coastal Maritime's offer failed because it did not specifically provide the capabilities and characteristics for the proposed Northwestern PSI pushback tractors. Id.; see also AR 917 (noting that Coastal Maritime failed to demonstrate equipment capability).

The Army similarly found deficiencies for Technical Factor 1 in its initial evaluation of Ceres Gulf's proposal. AR 2329. Ceres Gulf provided a list of equipment and the names of vendors from which it would obtain the specialized equipment on short notice. The Army, however, determined that Ceres Gulf's proposal did not provide proof of any lease agreements with the proposed vendors. Id.; see also AR 917 (noting that

Ceres Gulf did not demonstrate equipment capability).  Therefore, Ceres Gulf's initial proposal also received an overall rating of "Fail."  AR 2329.

Although none of the initial proposals was considered acceptable, the Army determined that the technical deficiencies identified in the proposals could be resolved through discussions with offerors, pursuant to FAR 15.306.  AR 919.  The Army then established the competitive range by including all [. . .] offerors, and it began conducting discussions.  Id.

C.  Discussions with Offerors

In a letter dated January 22, 2010, the Army opened discussions with Ceres Gulf, inviting the company to respond to an Evaluation Notice ("EN") identifying the deficiencies in its initial proposal.  AR 741-43.  EN201B specifically addressed Ceres Gulf's failure to meet the requirements of Technical Sub-factor 1c, noting that Ceres Gulf did not provide proof of ownership, lease agreements, or other arrangements to ensure the timely availability of the heavy tow equipment.  See AR 743 ("No supporting information was provided when demonstrating the proposed [. . .] is capable of providing the heavy vehicle recovery services.").  The Army thus requested Ceres Gulf to provide sufficient information to demonstrate that it had access to the specialized equipment listed in the PWS.  Id.

Ceres Gulf responded to the Army's letter on January 29, 2010 providing commitment letters and rental contracts for the heavy tow equipment that it intended to lease.  See AR 752, 763-66.  The Army's Technical Evaluation Team ("TET") evaluated Ceres Gulf's response and determined that the company provided "an adequate response to this EN and [is] expected to sufficiently address this in the revised proposal."  AR 882.

The Army also sent a letter to Coastal Maritime on January 22, 2010, opening discussions and allowing Coastal Maritime to respond to the deficiencies the Army identified in its initial proposal.  AR 888-89.  In this letter, the Army referenced EN401B, which stated that Coastal Maritime failed to meet the requirements for Technical Sub-factor 1c.  AR 889.  Specifically, EN401B provided that "[t]he proposal does not adequately demonstrate the Specialized Equipment Capability for PSA services.  The equipment is listed but there is no demonstration of its capability."  Id.  The Army therefore required Coastal Maritime to "[p]rovide sufficient information to clearly demonstrate that the offered specialized PSA equipment has the capability to perform the services requirement in the PWS.  This should include any manufacturer's specifications and records or reports of testing conducted to verify the equipment's capabilities."  AR 890.  Critically, the January 22, 2010 letter did not identify any deficiency with Coastal Maritime's leasing arrangements for heavy tow equipment.  See AR 888-92.

Coastal Maritime responded to the Army's letter on January 27, 2010.  AR 895.
In its response, Coastal Maritime advised the Army that it intended to use the [. . .].  AR
896.  Coastal Maritime explained that "[. . .] can tow a unit up to [. . .] pounds . . . , and
the [. . .] has a towing [. . .]." Id.  Coastal Maritime also included in its response
manufacturers' specifications for both towing vehicles.  Id.; see also AR 903-10.

After evaluating Coastal Maritime's response, the TET noted that "Coastal
Maritime has provided some additional information in the response to this EN.  It is not
however clear if it is sufficient to meet the technical evaluation standard."  AR 912.  The
TET's Evaluation Team Lead ("Team Lead") further expressed his concerns regarding
Coastal Maritime's response to EN401B in a Memorandum for Record dated February 1,
2010.  AR 886.1.  In that memorandum, the Team Lead concluded that because it was
unclear whether the information Coastal Maritime provided was sufficient, Coastal
Maritime's final proposal would "have to be evaluated to reveal if [the information
provided] will be acceptable." Id.  The Team Lead noted however, that "the government
clearly described the deficiency and gave Coastal the opportunity to correct it." Id.  He
further wrote: "It was determine [sic] that the initial round of discussions was sufficient
to address the proposal discrepancies of each proposal, ensure the adequate understanding
of the requirement by the vendors and have a reasonable expectation of obtaining
multiple final proposals that would be determined technically acceptable upon
evaluation."  AR 886.2.  The Army did not engage in further discussions with Coastal
Maritime.

D.   Final Proposals

On February 1, 2010, the Army closed discussions and invited all offerors to
submit final proposals that "should address all aspects of the [S]olicitation to include
clarifications submitted in response to the discussions."  AR 885, 915.  Ceres Gulf timely
submitted its final proposal on February 9, 2010, incorporating the information from its
response to the Army's EN.  See AR 1560-71.  In its evaluation of Ceres Gulf's final
proposal, the TET concluded that Ceres Gulf successfully addressed its previous
deficiency by providing written confirmation from a vendor for lease of heavy tow
equipment.  AR 2340.  The TET also found that Ceres Gulf adequately [. . .] for heavy
equipment weighing up to 150,000 pounds.  AR 2341.  Ceres Gulf therefore received an
overall rating of "Pass" for its final proposal.  AR 2340.

Coastal Maritime also timely submitted its final proposal on February 11, 2010,
incorporating the same material that it included in its response to the Army's EN.  AR
1732; 1734-73; 2194-2200.  Additionally, Coastal Maritime included in its final proposal
a lease agreement from [. . .] and a lease proposal from [. . .] with a [. . .].  AR 2145-46,

2193.  Coastal Maritime also included the manufacturer's specifications for another piece of specialized equipment, [. . .].  AR 2201-39.

While the TET acknowledged the additional information that Coastal Maritime provided in its final proposal, it noted that Coastal Maritime still failed to provide the capabilities and characteristics of the [. . .].  AR 2344.  The TET further noted that "Coastal Maritime fail[ed] to provide proof of lease arrangements of four (2 in Beaumont, 2 in Corpus Christi) Heavy Tow Vehicles (50K-150K capacity under 10'6")."  Id.  The contracting officer accepted the TET's findings in her March 16, 2010 Source Selection Decision.  AR 2350-56.  The contracting officer determined that Coastal Maritime did not provide the necessary specifications and characteristics for the [. . .] or the appropriate leasing agreements for the actual equipment listed in its proposal.  AR 2353.  The contracting officer concluded that Coastal Maritime's final proposal was unacceptable as to Technical Sub-factor 1c because there was "no evidence the equipment in the lease agreement or the tech proposals c[ould] perform the required functions."  Id.

E.  The Award to Ceres Gulf and Coastal Maritime's Debriefing

Although Coastal Maritime was the lowest priced offeror, the contracting officer found its proposal unacceptable because of the unresolved deficiency for Technical Sub-factor 1c.  AR 2353 ("The overall technical proposal is rated as unacceptable as the rating for factor 1c is unacceptable.").  Ceres Gulf submitted the second lowest price, and the Army found its proposal to be technically acceptable.  AR 2340-42; 2353-2356.  Thus, on March 22, 2010, the Army awarded Ceres Gulf the contract for a one-year base period and three one-year options.  AR 2358.  The Army also informed Coastal Maritime on the same date that its proposal was considered technically unacceptable due to its non-compliance with Technical Sub-factor 1c.  AR 2361.

On March 29, 2010, the Army conducted a post-award debriefing with Coastal Maritime.  AR 2368.  Army personnel explained the Government's rationale for its award decision and its basis for concluding that Coastal Maritime's proposal was unacceptable.  See AR 2375-99 (debriefing presentation).  The contracting officer specifically informed Coastal Maritime that it was required to "provide sufficient information to clearly demonstrate the offered specialized PSA equipment ha[d] the capability to perform the services required in the PWS."  AR 2395.  According to the contracting officer, Coastal Maritime only had asserted the capability of its equipment and had not provided the correct information to support its assertions.  Id.  The Army further advised Coastal Maritime that its final proposal was considered unacceptable because the enclosed lease agreements were not for the equipment proposed in its technical proposal.  AR 2396.

F.  Protests Before the GAO

Coastal Maritime filed a bid protest with the GAO on April 2, 2010.  AR 2419.
Coastal Maritime argued that it was fully compliant with the Technical Sub-factor 1c
specifications and that it had been disqualified because the Army had applied an unstated
requirement in the Solicitation.  AR 2425 ("SDDC is disqualifying Coastal for technical
criteria that is not stated or articulated in the RFP.").  According to Coastal Maritime,
there was no requirement in the Solicitation for the offeror to calculate the "translation
from the toe [sic] bar thrust requirements over to the calculation showing the ability to
move a 150,000 pound inoperable vehicle."  Id.  Rather, the Solicitation allegedly only
"call[ed] for the items having the capability to do that."  Id.  Coastal Maritime further
contended that the Army failed to engage in meaningful discussions with it after the
TET's evaluation of its initial proposal.  AR 2426.

In light of these allegations, the Army decided to take corrective action.  See AR
2484-85.  On April 29, 2010, the Army notified the GAO that it would amend the
Solicitation requirement challenged in the protest, reopen discussions with all offerors
previously in the competitive range (if necessary), and request new final proposals from
which it would render an award decision.  AR 2474-75; 2484-85.  On May 3, 2010, the
GAO dismissed Coastal Maritime's protest as academic.  AR 2476.

Ceres Gulf filed a protest with GAO on May 6, 2010 challenging the Army's
decision to take corrective action by amending the Solicitation and requesting revised
proposals.  AR 2477.  Similar to its complaint before this Court, Ceres Gulf argued at the
GAO that the Army's original award should stand because any alleged defects in the
Solicitation were "too minor to justify reopening discussions."  AR 2478.  Thus,
according to Ceres Gulf, the Army lacked a reasonable basis for reopening the
procurement.  AR 2479-81.[2]  The Army moved to dismiss Ceres Gulf's protest on May
12, 2010, arguing that "[t]he Agency made a good faith decision to take corrective action
in response to Coastal's protest because the Agency determined [its] discussion with
Coastal had not been meaningful on the very issue for which Coastal's proposal had been
determined to be technically unacceptable."  AR 2526.  On May 26, 2010, the GAO
dismissed this protest after Ceres Gulf filed suit in Court.  AR 2533.

---

[2]  Ceres Gulf also requested the GAO to reinstate the award.  See, e.g., AR 2531.  On May 12, 2010, the GAO
informed counsel for Ceres Gulf that the Competition in Contracting Act ("CICA") does not authorize the GAO to
order an agency to reinstate a contract.  See AR 2352; see also 31 U.S.C. §§ 3551-56.

G.   <u>Amended Solicitation</u>

After terminating the contract with Ceres Gulf for convenience on May 17, 2010, the Army amended the Solicitation requirements relating to Technical Factor 1.  AR 592, 614.  In the revised Solicitation, the Army provided instructions to offerors "to ensure an accurate and fair evaluation" of the information submitted.  AR 614.  Specifically, the instructions called for offerors to include "vendor contingent lease(s) or similar agreement(s)" clearly demonstrating that the required number of heavy towing equipment would be available from the first day of contract performance throughout the performance period.  Id.  Additionally, the instructions required offerors to include in their proposals "manufacturer's specifications, manufacturer's test data, and/or a certification from the offeror's equipment supplier that each piece of proposed Heavy Tow Equipment has the capability to perform the PWS requirements of towing 150,000 pounds on ramp inclines of 12 degrees with deck clearance as low at 10'6"."  Id.  The instructions emphasized that the specifications must be "clearly set forth and not implied or inferred from the information submitted."  Id.

In addition to the new instructions, the amended Solicitation modified Technical Sub-factor 1c by removing the reference to heavy equipment recovery vehicles.  Compare AR 195 with AR 614.  The amended Solicitation also added a Technical Sub-factor 1d, entitled "Equipment" which provides:

> The Offerors' proposals will be evaluated to determine their ability to perform required stevedoring-related terminal services in accordance with the Performance Work Statement (PWS).   Offeror's equipment is satisfactory to meet the requirements of this solicitation, relative to:
> PSA:
> (4-each) Heavy Tow Equipment (50,000-150,000 cap) under 10'6."

AR 614-15.  Like the new instructions, Technical Sub-factor 1d emphasized that offerors must provide proof of leases, manufacturer specifications, and equipment capable of towing 150,000 pounds on a ramp with an incline of 12 degrees.  AR 615.

After the amended Solicitation was issued, Ceres Gulf filed suit in this Court requesting an injunction and requiring any new award decision for this contract to be made on the basis of prior proposals.  (Compl. 3-5.)  On June 2, 2010, Ceres Gulf and Coastal Maritime submitted revised final proposals in response to the new Solicitation.  The Army has agreed to postpone any new award until the Court rules on the parties' dispositive motions.

Legal Standards for Decision

A.  Standard for Judgment on the Administrative Record

Unlike a motion for summary judgment, the Court reviews motions for judgment on the administrative record to determine whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  Bannum, Inc. v. United States, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005).  This Court previously has likened resolutions of cross-motions for judgment on the administrative record "to an expedited trial on the paper record."  A& D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc., 404 F.3d at 1356); see also Kerr Contractors, Inc. v. United States, 89 Fed. Cl. 312, 318 (2009), aff'd 2010 WL 1838867 *1 (Fed. Cir. May 7, 2010); Williams v. United States, 91 Fed. Cl. 560, 567 (2010).  The Court will make findings of fact where necessary to determine whether "a protester has met its burden of proof that an award is arbitrary, capricious . . . or violates to prejudicial effect an applicable procurement regulation."  Tech. Sys., Inc. v. United States, 50 Fed. Cl. 216, 222 (2001).  In this case, the relevant facts are not in dispute.

B.  Standard of Review in Bid Protests

This Court reviews an agency's action pursuant to the standards set forth in the Administrative Procedure Act ("APA").  5 U.S.C. § 706.  The APA provides that this Court shall set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (incorporated by reference in 28 U.S.C. § 1491(b)(4)); Bannum, Inc., 404 F.3d at 1351.  Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure.  DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Where, as in this case, a challenge is brought under the first ground, the Court must consider whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 221 (2008); see also Banknote Corp. of Amer., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

The plaintiff bears a heavy burden of demonstrating that the award decision lacked a rational basis.  Impresa, 238 F.3d at 1332-33.  This standard of review is highly deferential, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000), and entitles the agency's decision to a "presumption of regularity." Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (internal citation omitted).  If the agency's decision was reasonable, the Court may not substitute its own judgment, even if it may have "interpreted and applied the procurement

regulations in a different fashion had the court been in the agency's position." Holloway & Co. v. United States, 87 Fed. Cl. 381, 389 (2009). Therefore, the Court must perform a careful review of the agency's decision to ensure that it had a rational basis or did not involve a violation of regulation or procedure. CHE Consulting, Inc. v. United States, 74 Fed. Cl. 742, 746 (2006).

Where the Court determines that the "[G]overnment acted without a rational basis . . . it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct." Bannum, Inc., 404 F.3d at 1351; see also DMS All-Star, 90 Fed. Cl. at 662. In a pre-award protest, the protester can establish prejudice by showing a "non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1361 (citing WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748, 763 (1998)). In a post-award protest, the protester bears the burden of establishing prejudice by showing that there was a "substantial chance" it would have received the contract award absent the alleged violation. Bannum, Inc., 404 F.3d at 1353. A protester, however, is not required to "show that but for the alleged error, the protestor would have been awarded the contract." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

C. Motion to Dismiss for Lack of Subject Matter Jurisdiction

When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the Court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) *overruled on other grounds by* Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The plaintiff bears the burden of showing by a preponderance of the evidence that the Court possesses subject matter jurisdiction. Gov't Tech. Servs. v. United States, 90 Fed. Cl. 522, 525 (2009). If the Court determines at any time that it lacks subject matter jurisdiction, then it must dismiss the claim. A&D Fire Prot., Inc., 72 Fed. Cl. at 131.

Discussion

A. Jurisdiction

Jurisdiction is a threshold matter and must be determined before the Court may proceed to the merits of a claim. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Williams, 91 Fed. Cl. at 564. The Court's primary source for jurisdiction in bid protest cases is the Tucker Act. 28 U.S.C. § 1491(b). The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320

§ 12(a)-(b) (1996), waives sovereign immunity for claims against the United States and provides that this Court may render judgment on an action by an interested party "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491 (b)(1). This Court generally considers bid protests arising under three circumstances: (1) a pre-award protest objecting to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . of a contract," (2) a post-award protest, and (3) a protest objecting to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Id.; see also Magnum Opus Tech., Inc. v. United States, 2010 WL 2255523 at *9 (Fed. Cl. May 28, 2010).

The parties agree that Ceres Gulf is not asserting a post-award bid protest or contending that the Army violated a statute or regulation in connection with the stevedoring procurement. See Def.'s Reply 3-4; Pl.'s Reply 1-2. There is dispute, however, on whether Ceres Gulf's objection to the Army's corrective action should be considered a challenge to a "solicitation by a Federal agency for bids or proposals" for purposes of the Court's pre-award bid protest jurisdiction. Defendant argues that Ceres Gulf's protest does not fall under this Court's pre-award bid protest jurisdiction because it does not challenge any terms in the amended Solicitation or argue that Ceres Gulf is being prevented from competing for a new award. (Def.'s Mot. 13.) According to the Government, Ceres Gulf "has only complained about the mere fact that any corrective action was taken," and "has never suggested that it [was] complaining about the particular nature of the corrective action here." (Def.'s Reply 3-4.) Therefore, without a challenge to any "illegality or term in the amended solicitation," Defendant argues that this Court cannot review Ceres Gulf's protest. Id. at 4.

Defendant's narrow application of the Court's bid protest jurisdiction is contrary to established law. This Court has held that where a plaintiff, as the contract awardee, files a protest challenging an agency's decision to resolicit a proposal, the plaintiff's protest "is in the nature of a pre-award claim." IMS Servs., Inc. v. United States, 32 Fed. Cl. 388, 398 (1994); see also Logicon, Inc. v. United States, 22 Cl. Ct. 776 (1991) (taking jurisdiction of the plaintiff's claim where the government rescinded its contract); Firth Constr. Co. v. United States, 36 Fed. Cl. 268 (1996); Centech Group, Inc. v. United States, 78 Fed. Cl. 496, 505 (2007) (finding that the plaintiff's objection to the Air Force's issuance of a new amendment was an allegation of "preaward conduct"); Aeolus Sys., LLC v. United States, 79 Fed. Cl. 1, 5 n.6 (2007) (noting the protest "functions as a

pre-award protest" where the Army cancelled the plaintiff's contract award and proceeded to award the contract to a HUBZone qualified offeror).[3]

The Court's discussion of pre-award bid protest jurisdiction in IMS Services, Inc. particularly is relevant here. In that case, the plaintiff argued that its claim fell under the Court's pre-award bid protest jurisdiction because the Navy rescinded its contract and required it to participate in a second round of best and final offer negotiations with other offerors. 32 Fed. Cl. at 397. In concluding that it had jurisdiction, the Court reasoned that despite the existence of a contract, the plaintiff's claims were indeed in the nature of a pre-award protest due to the Navy's subsequent actions. Id. The Court further explained:

> Although plaintiff has a piece of paper titled award/contract, which states that the contract has been awarded . . . , plaintiff has no certainty or reasonable expectation that [it] will be directed to proceed under the terms and conditions of the [previous] award. As a result, that piece of paper means very little. The court agrees that a finding that plaintiff's claims are in the nature of a post-award protest would be to engage in a legal fiction. All plaintiff has is a mere hope that after the resolicitation process, plaintiff may once again be selected, and that, this time, the defendant will order it to proceed to performance.

Id. at 399.

The Court in Unified Industries, Inc. v. United States, 24 Cl. Ct. 570 (1991), similarly found that it had jurisdiction to review the plaintiff's claim as a pre-award bid protest where the agency terminated its contract and reissued a new solicitation. In that case, the Court noted the plaintiff had a "legally binding promise" from the Government when it was awarded the contract. Id. at 573. However, when the Government decided to terminate that contract, the Court reasoned that the plaintiff was left with only the possibility that it would be awarded the contract again. Id. The Court concluded that "[i]n such a situation, it would be to create a legal fiction to find a contract existing . . . ." Id. Accordingly, the Court found jurisdiction to grant injunctive relief. Id.

---

[3]   The Court in Aeolus Systems noted that because the protest followed an award, it also could have been described as a post-award bid protest. 79 Fed. Cl. at 5 n.6. Nevertheless, the Court concluded that no matter how described, it has jurisdiction over pre-award and post-award bid protests and therefore proceeded to the merits of the claim. Id.

In more recent cases, this Court and the Federal Circuit have ruled that jurisdiction exists to review an agency's corrective action decision. See, e.g., Centech Group, Inc., 78 Fed. Cl. at 506; Chapman Law Firm v. United States, 490 F.3d 934, 938 (Fed. Cir. 2007) (holding that the Court's inquiry into the reasonableness of the government's proposed corrective action was proper); ManTech Telecomm. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 65 (2001) ("The Court . . . will not object to any agency's proposed corrective action provided it is reasonable under the circumstances.") (internal citation omitted)). Indeed, in Centech Group, Inc., a case factually similar to the present case, the Court emphasized "[t]he fact that an agency procurement action was taken as corrective action resulting from a GAO bid protest does not immunize that action from judicial review." 78 Fed. Cl. at 506. To the contrary, "this Court possesses jurisdiction to determine if the corrective action taken by a procuring agency as a result of a bid protest was reasonable under the circumstances." [4] Id.

The factual circumstances here are indistinguishable from the aforementioned cases. In this case, the Army awarded Ceres Gulf the stevedoring contract as the lowest priced, technically acceptable offeror. Following Coastal Maritime's GAO bid protest, the Army decided to take corrective action by terminating the award to Ceres Gulf, revising the solicitation, and reopening discussions with all offerors in order to make a new award decision based on revised proposals. AR 2484-85. Ceres Gulf's previous award, in effect, is a nullity. As a result of the Army's corrective action, Ceres Gulf is no longer the successful awardee but rather a potential offeror with only a possibility of prevailing in the second round of the procurement process. Its claims before this Court therefore amount to an objection to the Army's pre-award conduct. Contrary to the Government's assertion, Ceres Gulf need not challenge precise terms in the amended solicitation in order for this Court to have pre-award bid protest jurisdiction. The Army's decision to reopen the procurement itself provides the Court with the jurisdiction necessary to review Ceres Gulf's claims. See Centech Group, Inc., 78 Fed. Cl. at 506. Therefore, the Government's motion to dismiss for lack of subject matter jurisdiction must be denied.

---

[4]   The Government's reliance on Data Monitor Systems, Inc. v. United States, 74 Fed. Cl. 66 (2006) is misplaced. In that case, the plaintiff filed suit challenging the Air Force's decision to terminate its contract and resolicit the requirements under a new procurement. Id. at 67, 70. While the Court first found that it lacked jurisdiction to enjoin the Air Force's termination of the plaintiff's contract because the plaintiff failed to point to any statutory schemes in its complaint, the Court nonetheless proceeded to address the merits of the plaintiff's claims. Id. at 73. In this case, as previously discussed, Ceres Gulf is not asking this Court to enjoin the Army's termination of its contract, and is not asserting that the Army violated a statutory or regulatory scheme. Accordingly, the Court's decision in Data Monitor Systems is inapplicable.

B. Ripeness

Defendant also suggests that this Court should dismiss Ceres Gulf's protest because the Army's decision to undertake corrective action was a "non-final" agency decision, which is not ripe for review.  (Def.'s Mot. 12, 14-15; Def.'s Reply 2.)  This argument similarly is without merit.

A claim is not ripe where it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568, 580-81 (1985) (internal citation omitted).  The purpose of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreement over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) *overruled on other grounds by* Califano v. Sanders, 430 U.S. 99 (1997).  The Court takes into account two factors when determining whether an agency action is ripe for review: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." Madison Servs., Inc. v. United States, 90 Fed. Cl. 673, 678 (2009) (quoting Abbott Labs., 387 U.S. at 149); see also Confederated Tribes & Bands of the Yakama Nation v. United States, 89 Fed. Cl. 589, 604 (2009).  Under the first factor, an action is not fit for judicial review "until the allegedly offending agency has adopted a final decision." Madison Servs., Inc., 90 Fed. Cl. at 678 (quoting NSK, Ltd. v. United States, 510 F.3d 1375, 1384 (Fed. Cir. 2007)).  An agency's decision is considered final where it (1) "marks 'the consummation of the agency's decision making process,' i.e. it must not be merely tentative or interlocutory, and (2) 'the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow.'" Id. (internal citation omitted).  The first factor thus requires the Court to consider whether further factual development would advance its ability "to deal with the legal issues presented." Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003).

The second factor takes into account whether "withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." Confederated Tribes, 89 Fed. Cl. at 604 (quoting Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278, 1295 (Fed. Cir. 2007)).  "A sufficient risk of immediate hardship may warrant prompt adjudication." Id. (citing Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1580-81 (Fed. Cir. 1993)).

Defendant argues that the Army's decision to undertake corrective action is "but one step in the process of the agency's decision making process for an award" and "the corrective action does not mark the consummation of the agency's decision."  (Def.'s

Mot. 14.)  Such assertions overlook the factual circumstances of this case.  As previously discussed, the Army's decision to undertake corrective action effectively requires Ceres Gulf to compete again for a solicitation it previously won.  With the prior award no longer viable, Ceres Gulf must now submit a new proposal based on amended terms.  See AR 2484-85.  Thus, contrary to Defendant's assertions, the new solicitation in fact marks the consummation of the Army's decision to void the previous award and require Ceres Gulf (and all other offerors within the competitive range) to start anew.

The Court similarly finds the second prong of the ripeness doctrine satisfied.  As a result of the termination for convenience, Ceres Gulf has lost its status as a successful awardee and must now recompete for the procurement.  By Defendant's own admission, Ceres Gulf now only has the possibility of acquiring the contract award again.  Without a doubt, the Army's corrective action decision has immediately and substantially impacted Ceres Gulf, making its claims in this case ripe for review.

Moreover, were the Court to dismiss Ceres Gulf's claims as unripe for review, its current protest grounds later could be challenged as untimely should Ceres Gulf not prevail during this second round of the procurement process.  As the Federal Circuit in Blue and Gold Fleet, L.P. v. United States made clear, a party must challenge an alleged impropriety in a solicitation before the closing of the bidding process in order to prevent "waiv[ing] its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d at 1313.  Indeed, "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."  Id. at 1314 (quoting Argencord Mach. & Equip. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).  By challenging the Army's decision to resolicit the procurement, Ceres Gulf is attempting to comply with the very rules this Court and the Federal Circuit have established.  Granting Defendant's motion to dismiss then would be tantamount to denying Ceres Gulf any judicial review of its present claims.  See Centech Group, Inc., 78 Fed. Cl. at 506.  Defendant's motion to dismiss Ceres Gulf's complaint as unripe for review therefore is DENIED.  The Court will proceed to address the merits of Ceres Gulf's claims.

C.  The Army's Corrective Action Decision

Ceres Gulf argues that, because the Army's initial discussions with Coastal Maritime were meaningful, the Army's decision to take corrective action following Coastal Maritime's GAO protest lacked a rational basis.  (Compl. 3-4; Pl.'s Mot. 6-7.) According to Ceres Gulf, the Army adequately apprised Coastal Maritime of the deficiencies in its initial proposal, and Coastal Maritime merely failed to remedy such deficiencies, rendering its final proposal technically unacceptable.  (Pl.'s Mot. 3-4.)

Ceres Gulf further contends that there is no material difference between the terms of the amended Solicitation and the original Solicitation. (Pl.'s Mot. 3-4 (citing AR 615).) Rather, by adding substantially similar terms to the amended Solicitation, Ceres Gulf alleges that the Army unfairly is giving Coastal Maritime another opportunity to compete. (Pl.'s Mot. 4, 7.)

The Court finds Ceres Gulf's protest grounds to be without merit. As explained below, the Army's failure to engage in fair and meaningful discussions with Coastal Maritime justifies the decision to take corrective action and to terminate the contract with Ceres Gulf. The amended Solicitation adequately and appropriately addresses the errors in the initial procurement and ensures that all offerors will be evaluated based on the same criteria. Accordingly, the Court will not overturn the Army's decision to reissue the Solicitation.

1. The Army's Decision to Take Corrective Action Remedied a Lack of Fair and Meaningful Discussions.

Contracting officers are afforded broad discretion to take corrective action if they determine that "such action is necessary to ensure fair and impartial competition." Ravens Group, Inc. v. United States, 78 Fed. Cl. 390, 399 (2007) (quoting Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 574 (2002) (internal citation omitted)). The contracting officer need not identify a particular error in the procurement process "as a precondition to proposing corrective action." ManTech Telecomm., Inc., 49 Fed. Cl. at 72. Where "a decision to amend a solicitation and request revised offers is made in good faith, without the intent to change a particular offeror's ranking or to avoid an award to a particular offeror, that decision will not be disturbed." Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 527 (2003) (citing ManTech Telecomm., Inc., 49 Fed. Cl. at 73); see also Omega World Travel, Inc., 54 Fed. Cl. at 574 ("Where a contracting officer's actions are 'reasonable under the circumstances' they will not be determined contrary to law.") (internal citations omitted)).

In this case, the Court finds rational the Army's decision to take corrective action following Coastal Maritime's GAO protest. A review of the administrative record demonstrates that the Army's discussions with Coastal Maritime were lacking in two respects. First, before closing discussions, the Army did not inform Coastal Maritime that it failed to demonstrate viable leasing arrangements for four heavy tow vehicles. Technical Sub-factor 1c required offerors to include in their proposals "*all* lease and other agreements in place that establish the Offeror has ready access to required specialized . . . equipment in a timely basis." AR 196 (emphasis added). During the Army's review of Coastal Maritime's initial proposal, the TET noted that Coastal Maritime provided lease proposals for [. . .], but did not provide any information as to the

characteristics and capabilities of the [. . .].  <u>See</u> AR 2343; <u>see also</u> AR 917.  The Army thus considered as a deficiency Coastal Maritime's failure to address the leasing arrangements for all of the aforementioned vehicles.  AR 2343-44.  During its discussions with Coastal Maritime, however, the Army made no mention of this deficiency.  <u>See</u> 889-90.  Instead, it simply deemed Coastal Maritime's final proposal technically unacceptable because Coastal Maritime's proposal lacked proof of lease agreements for all of its heavy towing equipment.  <u>See</u> AR 2344 (noting that company "fail[ed] to provide proof of lease arrangements of four . . . Heavy Tow Vehicles.")  The contracting officer's Source Selection Decision accepted the TET's findings and determined that Coastal Maritime's offer was unacceptable because the leasing agreements it provided did not correspond with the equipment listed in its technical proposal.  AR 2353.  In contrast, the Army specifically advised Ceres Gulf during discussions that it had not provided proof of ownership or lease arrangements in accordance with Technical Sub-factor 1c.  <u>See</u> AR 743.  Ceres Gulf corrected this deficiency and thereafter received a favorable rating.  AR 2340.

FAR Part 15 provides that when engaging in discussions with potential offerors, contracting officers are, at a minimum, required to discuss with each offeror "deficiencies [and] significant weaknesses . . . to which the offeror has not yet had an opportunity to respond." 48 C.F.R. § 15.306(d)(3).  Such discussions are considered meaningful where they "generally lead offerors into the areas of their proposals requiring amplification or correction . . . ." <u>Advanced Data Concepts, Inc. v. United States</u>, 43 Fed. Cl. 410, 422 (1999), <i>aff'd</i> 216 F.3d 1054 (Fed. Cir. 2000).  Discussions therefore must be "as specific as practical considerations permit." <u>Id.</u>  Here, the Army failed to engage in any meaningful discussions with Coastal Maritime regarding its leasing arrangements.  In fact, the Army based in part its decision to disqualify Coastal Maritime for a deficiency of which the offeror was not aware.  In contrast, Ceres Gulf was advised to review its access arrangements and thereafter received a passing rating.  Contrary to Ceres Gulf's assertions, the Army's discussions with Coastal Maritime regarding its leasing arrangements were unfair and not meaningful.  The Army's decision to take corrective action to address this impropriety thus was reasonable under the circumstances.

The Army's discussions with Coastal Maritime also failed in another respect. Before the close of discussions, the Army did not inform Coastal Maritime that it had responded inadequately to the deficiency identified in the Army's January 22, 2010 notification letter.  In the letter, the Army merely informed Coastal Maritime that its proposal did not "adequately demonstrate the Specialized Equipment Capability for PSA services." AR 889.  Coastal Maritime thus responded by explaining that industry standards dictate that its proposed equipment could meet the Army's towing requirements.  AR 1738, 2271-73.  Despite the TET's apprehensions on whether Coastal Maritime's response satisfactorily addressed Technical Sub-factor 1c, the TET

nonetheless kept the company within the competitive range and permitted Coastal Maritime to submit final proposal revisions.   AR 915.   Thus, Coastal Maritime was unaware that, after discussions, its final proposal still was defective with respect to Technical Sub-factor 1c.

As previously noted, FAR 15.306(d) requires contracting officers to at least discuss with an offeror deficiencies or significant weaknesses in its proposal.   FAR 15.306(d) further encourages contracting officers to discuss with an offeror aspects of its proposal that could be "explained to enhance materially the proposal's potential for award." 48 C.F.R. § 15.306(d)(3).   If, after such discussions, an offeror's proposal still is unsatisfactory, FAR 15.306(c)(3) requires contracting officers to remove the proposal from the competitive range and formally eliminate the offeror from consideration for award.   48 C.F.R. § 15.306(c)(3).   As Defendant aptly notes, by failing to engage in meaningful discussions with Coastal Maritime regarding the capability of its equipment, the Army essentially invited Coastal Maritime to submit a final proposal that stood no chance for award.   See Def.'s Mot. 19.   Despite its concerns on whether Coastal Maritime's response was "sufficient to meet the technical evaluation standard," AR 912, the Army neither engaged in further discussions with Coastal Maritime, nor eliminated it from the competitive range for its deficiency.   The Army thus properly exercised its discretion to take corrective action and remedy the impropriety in the procurement process.

Ceres Gulf makes much of the fact that the Evaluation Team Lead, in his February 1, 2010 memorandum, emphasized that the Government "clearly described the deficiency [in Coastal Maritime's initial proposal] and gave Coastal the opportunity to correct it." AR 886.1; see also Pl.'s Mot. 7; Pl.'s Reply 2-3.   The agency may have originally believed that Coastal Maritime had been adequately apprised of its deficiency in responding to Technical Sub-factor 1c.   However, that belief does not render the contracting officer's later decision to take corrective action unreasonable or unlawful. Where a contracting officer's determination to take corrective action is reasonable under the circumstances, it will not be overturned.   Omega World Travel, Inc., 54 Fed. Cl. at 574.   In this case, the administrative record demonstrates that Coastal Maritime was not adequately informed of its deficiency in responding to Technical Sub Factor 1c.   The Army's decision to remedy that error therefore was entirely appropriate and shall not be overturned.

2.   The Amended Solicitation Serves as an Appropriate Means to Remedy the Errors in the Procurement.

Ceres Gulf argues that even if there were errors in the procurement process, the Army's decision to reissue the Solicitation lacked a rational basis because the terms of

the amended Solicitation do not materially differ from the original Solicitation, but merely provide Coastal Maritime with another opportunity to compete. (Pl.'s Mot. 6-7; Pl.'s Reply 4-5.) The Court's review of the administrative record, however, confirms that the amended Solicitation reasonably addresses the deficiencies identified in the procurement process.

Coastal Maritime's protest before the GAO claimed that the Army failed to engage in meaningful discussions with it and improperly disqualified it for a technical criterion that was not articulated in the Solicitation. AR 2425-27. From Coastal Maritime's perspective, the Solicitation did not require offerors to make detailed calculations that their heavy tow equipment was capable of hauling 150,000 pounds. AR 2425-26. Thus, in response to the Army's notification letter, Coastal Maritime provided what it presumed was sufficient information from its equipment suppliers demonstrating that its proposal was in compliance with Army's specifications. AR 2426. However, after discussions, the Army did not again comment upon Coastal Maritime's response to the discussion question, and "at no time raise[d] any issue with respect to Coastal Maritime's response to the information previously provided on the [. . .] at issue." AR 2422. Coastal Maritime argued that "[i]f the government had some very specific requirement about how to make calculations, or how a formula should be displayed it did not engage in meaningful discussions when it failed to disclose that in its negotiation questions with Coastal, and others." AR 2424; see also AR 2425, 2427.

In response to Coastal Maritime's GAO bid protest, the Army decided to revise "the solicitation requirement that [was] the subject of Coastal's protest." AR 2474. As a result, the Army added four material terms to the amended Solicitation. First, under Technical Sub-factor 1(d), the Army required "manufacturer's specifications, manufacturer's test data, and/or . . . a certification from the offeror's equipment supplier that each piece of proposed heavy tow equipment has the capability to perform the PWS requirements of towing 150,000 pounds on ramp inclines of 12 degrees. . . ." AR 615. The Army emphasized that the capability of offerors' proposed equipment must be "clearly set forth and not implied or inferred from the information submitted." Id. In addition, the Army instructed offerors in Technical Sub-factor 1(d) to provide "vendor contingent lease[s] or other similar agreement[s] for the required number of Heavy Tow Vehicles." Id. The specialized equipment (and the corresponding lease arrangements), moreover, had to be available "at each site from the first day of contract performance throughout the performance period." Id.

Contrary to Ceres Gulf's assertions, these revisions to the Solicitation do not offer Coastal Maritime with another opportunity to compete but rather directly address the objections raised before the GAO, and the Army's failure to engage in meaningful discussions with Coastal Maritime regarding lease arrangements. Indeed, by adding the

requirement that all offerors provide manufacturer's specifications, test data or other certifications, all offerors have a better understanding of how precisely to demonstrate that their equipment can haul 150,000-pound equipment. AR 614-15. The new 12 degree incline requirement similarly assures the Army and offerors alike that the equipment proposed can adequately haul heavy equipment uphill.

Ceres Gulf argues that the Army had no legitimate reason to include in the amended Solicitation a requirement that offerors provide leasing agreements or other similar arrangements. (Pl.'s Reply 3.) Ceres Gulf contends that Coastal Maritime never raised this issue before the GAO and therefore including it in the amended Solicitation is merely a "post-hoc justification." Id. However, the fact that Coastal Maritime did not raise the issue of leasing arrangements before the GAO does not mean that the Army's attempt to correct this procurement impropriety was somehow done in bad faith. On the contrary, the administrative record demonstrates that the Army had a reasonable basis to believe that it did not engage in fair or meaningful discussions with Coastal Maritime regarding this factor. As previously discussed, the Army neglected to discuss with Coastal Maritime its leasing arrangements before it disqualified Coastal Maritime's final proposal as unacceptable. Were the Army to fail to address leasing arrangements in the amended Solicitation, Coastal Maritime would still be disadvantaged during the second round of the procurement process. The Court thus finds that it was entirely appropriate and within the Army's well-reasoned discretion to include such terms in the amended Solicitation.

Ceres Gulf further suggests that the four new terms of the amended Solicitation do not alter the original Solicitation in any material respect. (Pl.'s Reply 3-5.) In particular, Ceres Gulf takes issue with the Army's incorporation of a 12 degree incline requirement in the amended Solicitation. Id. at 4-5. According to Ceres Gulf, Coastal Maritime "knew full well" that the stevedoring services in question involved ramps. Id. at 5. Ceres Gulf relies on the fact that all offerors participated in pre-proposal site visits at each of the three ports. During the site visits, the Army answered all questions posed by prospective offerors. Id. at 5 (citing AR 301).) However, a review of the administrative record demonstrates that none of the questions posed by potential offerors discussed whether 150,000-pound vehicles had to be hauled at an incline. See AR 301-02. Moreover, as Coastal Maritime notes, not all vehicles are capable of pulling 150,000 pounds on ramps with 12 degree inclines. (Def. Intervenor's Mot. 15.) Ceres Gulf's own proposed [. . .] equipment only was capable of pulling 150,000 pounds [. . .]. AR 1570 (noting that "[. . .] [Ceres Gulf's] [. . .]"); AR 1727 (noting that most of Ceres Gulf's [. . .] equipment is capable of hauling 150,000 pounds.). Thus, as neither Coastal Maritime nor Ceres Gulf proposed equipment capable of pulling the maximum weight on an incline, the Court finds reasonable the Army's determination that this new requirement was necessary to ensure offerors could meet the Army's mission.

Ceres Gulf also objects to the new requirement that offerors include in their revised proposals manufacturer specifications, test data or certifications to establish towing capability.   (Pl.'s Reply 4-5.)   However, as previously noted, this new requirement is a reasonable solution to address the prior ambiguity on how offerors can demonstrate that their equipment is capable of pulling 150,000-pound inoperable equipment.   Indeed, Ceres Gulf's final proposal to the Army included only letters from suppliers to prove its equipment was capable of towing the maximum weight capacity, and was still considered technically acceptable.   AR 752.   Coastal Maritime was not given the same opportunity to prove its equipment also complied with the Army's 150,000-pound hauling requirement.   As such, inclusion of this new term is entirely appropriate to remedy previous unfair and unequal discussions with offerors.

In a similar vein, Ceres Gulf contends there is no basis for the Army to include a requirement that the capability of offerors' proposed heavy tow equipment "be clearly set forth and not implied or inferred from the information submitted." (Pl.'s Reply 5.) Ceres Gulf argues that as part of the first round of proposals, the Army required offerors to "provide sufficient information to clearly demonstrate the capability of its equipment." Id.  According to Ceres Gulf, there is no material difference between the phrases "clearly set forth" and "clearly demonstrate."   Id.   The Court finds no merit to Ceres Gulf's assertion.  This amendment responds directly to Coastal Maritime's GAO protest and alleviates any ambiguity on how the Army intended offerors to demonstrate towing capability.  The new amendment makes clear that providing industry standards alone is insufficient to be considered technically acceptable.   Accordingly, the Court finds that including this amended term in the Solicitation was reasonable and ensures that offerors are fairly apprised of the Army's requirements.

The Court rejects Ceres Gulf's allegation that there is no difference between the terms of the original Solicitation and the amended Solicitation requiring offerors to provide proof of leases or other arrangements. Id. at 4. Rather, the amended Solicitation crystallizes the Army's intent that leases for the required equipment be in place from the start of contract performance. AR 614-15. The original Solicitation merely requires that offerors have "ready access" to any leases or similar agreements.  See AR 89.  Indeed, Coastal Maritime, in its final proposal to the Army, failed to provide a lease for its [. . .]. AR 2423. Ceres Gulf similarly neglected to provide the necessary proof of leases for its equipment in its initial proposal.  AR 917, 2329.  This new provision remedies any confusion regarding Technical Sub-factor 1c, and places all offerors on notice of the Army's desire to have leases in place at the start of contract performance.

Taken as a whole, the Court finds that the amended Solicitation made critical changes to the terms of Technical Factor 1 and appropriately addressed the deficiencies identified in the procurement process.  The amended terms of the Solicitation reasonably

relate to Coastal Maritime's objections before the GAO and ultimately promote fairness and integrity in a second round of the procurement process. Accordingly, the Court declines Ceres Gulf's invitation to render the amended Solicitation unnecessary.

### D.   Ceres Gulf is Not Entitled to Injunctive Relief

Ceres Gulf argues that it is entitled to injunctive relief as a matter of law. (Pl.'s Mot. 7-8.)  In determining whether a party is entitled to injunctive relief, the Court must consider whether: (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer "irreparable harm if the court withholds injunctive relief;" (3) the balance of hardships favors granting injunctive relief; and (4) such relief would be in the public interest. Career Training Concepts, Inc., 83 Fed. Cl. at 219; see also Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 369 (2004). Injunctive relief is an extraordinary remedy that will not be granted unless the plaintiff meets the heavy burden of meeting the four aforementioned factors. Afghan Amer. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 365 (2009). In this case, Ceres Gulf has failed to satisfy the first factor of succeeding on the merits of its claims. As the Court has discussed, the Army's decision to take corrective action and reissue the Solicitation was both reasonable under the circumstances and appropriate to address the apparent errors in the procurement process. Having failed to succeed on the merits, the Court need not address the three remaining factors. Accordingly, Ceres Gulf's request for injunctive relief is DENIED.

Conclusion

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's complaint for lack of subject matter jurisdiction is DENIED. Defendant's and Defendant-Intervenor's motions for judgment on the administrative record are GRANTED, and Plaintiff's cross-motion for judgment on the administrative record is DENIED. The Clerk is requested to enter judgment for Defendant. No Costs.

On or before September 3, 2010, counsel for the parties shall review carefully this opinion for competition-sensitive, proprietary, confidential, or other protected information and submit to the Court proposed redactions, if any, before the opinion is released for publication.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge